223 U.S. 1 (1912)
SECOND EMPLOYERS' LIABILITY CASES.
MONDOU
v.
NEW YORK, NEW HAVEN & HARTFORD RAILROAD CO.
NORTHERN PACIFIC RAILWAY CO.
v.
BABCOCK.
NEW YORK, NEW HAVEN & HARTFORD RAILROAD CO.
v.
WALSH.
WALSH
v.
NEW YORK, NEW HAVEN & HARTFORD RAILROAD CO.
Nos. 120, 170, 289, 290.
Supreme Court of United States.
Argued February 20, 21, 1911.
Decided January 15, 1912.
ERROR TO THE SUPREME COURT OF ERRORS OF THE STATE OF CONNECTICUT.
ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE DISTRICT OF MINNESOTA.
ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE DISTRICT OF MASSACHUSETTS.
*10 Mr. Donald G. Perkins for plaintiff in error in No. 120.
Mr. Edward D. Robbins, with whom Mr. Joseph F. Berry was on the brief, for defendant in error in No. 120.
Mr. Charles W. Bunn for plaintiff in error in No. 170.
Mr. Samuel A. Anderson for defendant in error in No. 170.
Mr. John L. Hall for plaintiff in error in No. 289 and defendant in error in No. 290.
*35 *46 MR. JUSTICE VAN DEVANTER, after stating the cases as above, delivered the opinion of the court.
The principal questions presented in these cases as discussed at the bar and in the briefs are: 1. May Congress, in the exertion of its power over interstate commerce, regulate the relations of common carriers by railroad and their employes while both are engaged in such commerce? 2. Has Congress exceeded its power in that regard by prescribing the regulations which are embodied in the act in question? 3. Do those regulations supersede the laws of the States in so far as the latter cover the same field? 4. May rights arising under those regulations be enforced, as of right, in the courts of the States when their jurisdiction, as fixed by local laws, is adequate to the occasion?
The clauses in the Constitution (Art. I, § 8, clauses 3 and 18) which confer upon Congress the power "to regulate commerce .. . among the several States" and "to make all laws which shall be necessary and proper" for the purpose have been considered by this court so often and in such varied connections that some propositions bearing upon the extent and nature of this power have come to be so firmly settled as no longer to be open to dispute, among them being these:
1. The term "commerce" comprehends more than the mere exchange of goods. It embraces commercial intercourse in all its branches, including transportation of passengers and property by common carriers, whether carried on by water or by land.
2. The phrase "among the several States" marks the distinction, for the purpose of governmental regulation, between commerce which concerns two or more States and commerce which is confined to a single State and does *47 not affect other States, the power to regulate the former being conferred upon Congress and the regulation of the latter remaining with the States severally.
3. "To regulate," in the sense intended, is to foster, protect, control and restrain, with appropriate regard for the welfare of those who are immediately concerned and of the public at large.
4. This power over commerce among the States, so conferred upon Congress, is complete in itself, extends incidentally to every instrument and agent by which such commerce is carried on, may be exerted to its utmost extent over every part of such commerce, and is subject to no limitations save such as are prescribed in the Constitution. But, of course, it does not extend to any matter or thing which does not have a real or substantial relation to some part of such commerce.
5. Among the instruments and agents to which the power extends are the railroads over which transportation from one State to another is conducted, the engines and cars by which such transportation is effected, and all who are in any wise engaged in such transportation, whether as common carriers or as their employes.
6. The duties of common carriers in respect of the safety of their employes, while both are engaged in commerce among the States, and the liability of the former for injuries sustained by the latter, while both are so engaged, have a real or substantial relation to such commerce, and therefore are within the range of this power. Cooley v. Board of Wardens, 12 How. 299, 315-317; The Lottawanna, 21 Wall. 558, 577; Sherlock v. Alling, 93 U.S. 99, 103-105; Smith v. Alabama, 124 U.S. 465, 479; Nashville &c. Ry. Co. v. Alabama, 128 U.S. 96, 99; Peirce v. Van Dusen, 78 Fed. Rep. 693, 698-700; Baltimore & Ohio R.R. Co. v. Baugh, 149 U.S. 368, 378; Patterson v. Bark Eudora, 190 U.S. 169, 176; Johnson v. Southern Pacific Co., 196 U.S. 1; Schlemmer v. Buffalo &c. Ry. Co., 205 U.S. 1; Employers' *48 Liability Cases, 207 U.S. 463, 495; Adair v. United States, 208 U.S. 161, 176-178; Baltimore & Ohio R.R. Co. v. Interstate Commerce Commission, 221 U.S. 612, 618; Southern Railway Co. v. United States, 222 U.S. 20.
As is well said in the brief prepared by the late Solicitor-General: "Interstate commerce  if not always, at any rate when the commerce is transportation  is an act. Congress, of course, can do anything which, in the exercise by itself of a fair discretion, may be deemed appropriate to save the act of interstate commerce from prevention or interruption, or to make that act more secure, more reliable or more efficient. The act of interstate commerce is done by the labor of men and with the help of things; and these men and things are the agents and instruments of the commerce. If the agents or instruments are destroyed while they are doing the act, commerce is stopped; if the agents or instruments are interrupted, commerce is interrupted; if the agents or instruments are not of the right kind or quality, commerce in consequence becomes slow or costly or unsafe or otherwise inefficient; and if the conditions under which the agents or instruments do the work of commerce are wrong or disadvantageous, those bad conditions may and often will prevent or interrupt the act of commerce or make it less expeditious, less reliable, less economical and less secure. Therefore, Congress may legislate about the agents and instruments of interstate commerce, and about the conditions under which those agents and instruments perform the work of interstate commerce, whenever such legislation bears, or in the exercise of a fair legislative discretion can be deemed to bear, upon the reliability or promptness or economy or security or utility of the interstate commerce act."
In view of these settled propositions, it does not admit of doubt that the answer to the first of the questions before stated must be that Congress, in the exertion of its power over interstate commerce, may regulate the relations *49 of common carriers by railroad and their employes, while both are engaged in such commerce, subject always to the limitations prescribed in the Constitution, and to the qualification that the particulars in which those relations are regulated must have a real or substantial connection with the interstate commerce in which the carriers and their employes are engaged.
We come, then, to inquire whether Congress has exceeded its power in that regard by prescribing the regulations embodied in the present act. It is objected that it has, (1) because the abrogation of the fellow-servant rule, the extension of the carrier's liability to cases of death, and the restriction of the defenses of contributory negligence and assumption of risk have no tendency to promote the safety of the employes or to advance the commerce in which they are engaged; (2) because the liability imposed for injuries sustained by one employe through the negligence of another, although confined to instances where the injured employe is engaged in interstate commerce, is not confined to instances where both employes are so engaged; and (3) because the act offends against the Fifth Amendment to the Constitution (a) by unwarrantably interfering with the liberty of contract and (b) by arbitrarily placing all employers engaged in interstate commerce by railroad in a disfavored class and all their employes engaged in such commerce in a favored class.
Briefly stated, the departures from the common law made by the portions of the act against which the first objection is leveled are these: (a) The rule that the negligence of one employe resulting in injury to another was not to be attributed to their common employer, is displaced by a rule imposing upon the employer responsibility for such an injury, as was done at common law when the injured person was not an employe; (b) the rule exonerating an employer from liability for injury sustained by an employe through the concurring negligence of the employer *50 and the employe is abrogated in all instances where the employer's violation of a statute enacted for the safety of his employes contributes to the injury, and in other instances is displaced by the rule of comparative negligence, whereby the exoneration is only from a proportional part of the damages corresponding to the amount of negligence attributable to the employe; (c) the rule that an employe was deemed to assume the risk of injury, even if due to the employer's negligence, where the employe voluntarily entered or remained in the service with an actual or presumed knowledge of the conditions out of which the risk arose, is abrogated in all instances where the employer's violation of a statute enacted for the safety of his employes contributed to the injury; and (d) the rule denying a right of action for the death of one person caused by the wrongful act or neglect of another is displaced by a rule vesting such a right of action in the personal representatives of the deceased for the benefit of designated relatives.
Of the objection to these changes it is enough to observe:
First. "A person has no property, no vested interest, in any rule of the common law. That is only one of the forms of municipal law, and is no more sacred than any other. Rights of property which have been created by the common law cannot be taken away without due process; but the law itself, as a rule of conduct, may be changed at the will . . . of the legislature, unless prevented by constitutional limitations. Indeed, the great office of statutes is to remedy defects in the common law as they are developed, and to adapt it to the changes of time and circumstances." Munn v. Illinois, 94 U.S. 113, 134; Martin v. Pittsburg & Lake Erie R.R. Co., 203 U.S. 284, 294; The Lottawanna, 21 Wall. 558, 577; Western Union Telegraph Co. v. Commercial Milling Co., 218 U.S. 406, 417.
Second. The natural tendency of the changes described *51 is to impel the carriers to avoid or prevent the negligent acts and omissions which are made the bases of the rights of recovery which the statute creates and defines; and, as whatever makes for that end tends to promote the safety of the employes and to advance the commerce in which they are engaged, we entertain no doubt that in making those changes Congress acted within the limits of the discretion confided to it by the Constitution. Lottery Case, 188 U.S. 321, 353, 355; Atlantic Coast Line R.R. Co. v. Riverside Mills, 219 U.S. 186, 203.
We are not unmindful that that end was being measurably attained through the remedial legislation of the several States, but that legislation has been far from uniform, and it undoubtedly rested with Congress to determine whether a national law, operating uniformly in all the States upon all carriers by railroad engaged in interstate commerce, would better subserve the needs of that commerce. The Lottawanna, 21 Wall. 558, 581-582; Baltimore & Ohio R.R. v. Baugh, 149 U.S. 368, 378-379.
The second objection proceeds upon the theory that, even although Congress has power to regulate the liability of a carrier for injuries sustained by one employe through the negligence of another where all are engaged in interstate commerce, that power does not embrace instances where the negligent employe is engaged in intrastate commerce. But this is a mistaken theory, in that it treats the source of the injury, rather than its effect upon interstate commerce, as the criterion of congressional power. As was said in Southern Railway Co. v. United States, 222 U.S. 20, 27, that power is plenary and competently may be exerted to secure the safety of interstate transportation and of those who are employed therein, no matter what the source of the dangers which threaten it. The present act, unlike the one condemned in Employers' Liability Cases, 207 U.S. 463, deals only with the liability of a carrier engaged in interstate commerce for injuries sustained *52 by its employes while engaged in such commerce. And this being so, it is not a valid objection that the act embraces instances where the causal negligence is that of an employe engaged in intrastate commerce; for such negligence, when operating injuriously upon an employe engaged in interstate commerce, has the same effect upon that commerce as if the negligent employe were also engaged therein.
Next in order is the objection that the provision in § 5, declaring void any contract, rule, regulation or device, the purpose or intent of which is to enable a carrier to exempt itself from the liability which the act creates, is repugnant to the Fifth Amendment to the Constitution as an unwarranted interference with the liberty of contract. But of this it suffices to say, in view of our recent decisions in Chicago, Burlington & Quincy Railroad Co. v. McGuire, 219 U.S. 549; Atlantic Coast Line Railroad Co. v. Riverside Mills, 219 U.S. 186, and Baltimore & Ohio Railroad Co. v. Interstate Commerce Commission, 221 U.S. 612, that if Congress possesses the power to impose that liability, which we here hold that it does, it also possesses the power to insure its efficacy by prohibiting any contract, rule, regulation or device in evasion of it.
Coming to the question of classification, it is true that the liability which the act creates is imposed only on interstate carriers by railroad, although there are other interstate carriers, and is imposed for the benefit of all employes of such carriers by railroad who are employed in interstate commerce, although some are not subjected to the peculiar hazards incident to the operation of trains or to hazards that differ from those to which other employes in such commerce, not within the act, are exposed. But it does not follow that this classification is violative of the "due process of law" clause of the Fifth Amendment. Even if it be assumed that that clause is equivalent to the "equal protection of the laws" clause of the Fourteenth *53 Amendment, which is the most that can be claimed for it here, it does not take from Congress the power to classify, nor does it condemn exertions of that power merely because they occasion some inequalities. On the contrary, it admits of the exercise of a wide discretion in classifying according to general, rather than minute, distinctions, and condemns what is done only when it is without any reasonable basis, and therefore is purely arbitrary. Lindsley v. Carbonic Gas Co., 220 U.S. 61, 78. Tested by these standards, this classification is not objectionable. Like classifications of railroad carriers and employes for like purposes, when assailed under the equal protection clause, have been sustained by repeated decisions of this court. Missouri Pacific Railway Co. v. Mackey, 127 U.S. 205; Louisville & Nashville Railroad Co. v. Melton, 218 U.S. 36; Mobile, Jackson & Kansas City Railroad Co. v. Turnipseed, 219 U.S. 35.
It follows that the answer to the second of the questions before stated must be that Congress has not exceeded its power by prescribing the regulations embodied in the present act.
The third question, whether those regulations supersede the laws of the States in so far as the latter cover the same field, finds its answer in the following extracts from the opinion of Chief Justice Marshall in McCulloch v. Maryland, 4 Wheat. 316:
(p. 405) "If any one proposition could command the universal assent of mankind, we might expect it would be this:  that the government of the Union, though limited in its powers, is supreme within its sphere of action. This would seem to result necessarily from its nature. It is the government of all; its powers are delegated by all; it represents all, and acts for all. Though any one State may be willing to control its operations, no State is willing to allow others to control them. The nation, on those subjects on which it can act, must necessarily bind its component *54 parts. But this question is not left to mere reason: the people have, in express terms, decided it, by saying, `this constitution, and the laws of the United States, which shall be made in pursuance thereof, . . . shall be the supreme law of the land,' and by requiring that the members of the state legislatures, and the officers of the executive and judicial departments of the States, shall take the oath of fidelity to it. The government of the United States, then, though limited in its powers, is supreme; and its laws, when made in pursuance of the constitution, form the supreme law of the land, `anything in the constitution or laws of any State, to the contrary notwithstanding.'
(p. 426) "This great principle is, that the constitution and the laws made in pursuance thereof are supreme; that they control the constitution and laws of the respective States, and cannot be controlled by them."
And particularly apposite is the repetition of that principle in Smith v. Alabama, 124 U.S. 465, 473:
"The grant of power to Congress in the Constitution to regulate commerce with foreign nations and among the several States, it is conceded, is paramount over all legislative powers which, in consequence of not having been granted to Congress, are reserved to the States. It follows that any legislation of a State, although in pursuance of an acknowledged power reserved to it, which conflicts with the actual exercise of the power of Congress over the subject of commerce, must give way before the supremacy of the national authority."
True, prior to the present act the laws of the several States were regarded as determinative of the liability of employers engaged in interstate commerce for injuries received by their employes while engaged in such commerce. But that was because Congress, although empowered to regulate that subject, had not acted thereon, and because the subject is one which falls within the police *55 power of the States in the absence of action by Congress. Sherlock v. Alling, 93 U.S. 99; Smith v. Alabama, 124 U.S. 465, 473, 480, 482; Nashville &c. Railway v. Alabama, 128 U.S. 96, 99; Reid v. Colorado, 187 U.S. 137, 146. The inaction of Congress, however, in no wise affected its power over the subject. The Lottawanna, 21 Wall. 558, 581; Gloucester Ferry Co. v. Pennsylvania, 114 U.S. 196, 215. And now that Congress has acted, the laws of the States, in so far as they cover the same field, are superseded, for necessarily that which is not supreme must yield to that which is. Gulf, Colorado and Santa Fe Railway Co. v. Hefley, 158 U.S. 98, 104; Southern Railway Co. v. Reid, 222 U.S. 424; Northern Pacific Railway Co. v. Washington, 222 U.S. 370.
We come next to consider whether rights arising under the congressional act may be enforced, as of right, in the courts of the States when their jurisdiction, as prescribed by local laws, is adequate to the occasion. The first of the cases now before us was begun in one of the Superior Courts of the State of Connecticut, and, in that case, the Supreme Court of Errors of the State answered the question in the negative. That, however, was not because the ordinary jurisdiction of the Superior Courts, as defined by the constitution and laws of the State, was deemed inadequate or not adapted to the adjudication of such a case, but because the Supreme Court of Errors was of opinion (1) that the congressional act impliedly restricts the enforcement of the rights which it creates to the Federal courts, and (2) that, if this be not so, the Superior Courts are at liberty to decline cognizance of actions to enforce rights arising under that act, because (a) the policy manifested by it is not in accord with the policy of the State respecting the liability of employers to employes for injuries received by the latter while in the service of the former, and (b) it would be inconvenient and confusing for the same court, in dealing with cases of the *56 same general class, to apply in some the standards of right established by the congressional act and in others the different standards recognized by the laws of the State.
We are quite unable to assent to the view that the enforcement of the rights which the congressional act creates was originally intended to be restricted to the Federal courts. The act contains nothing which is suggestive of such a restriction, and in this situation the intention of Congress was reflected by the provision in the general jurisdictional act, "That the circuit courts of the United States shall have original cognizance, concurrent with the courts of the several States, of all suits of a civil nature, at common law or in equity, where the matter in dispute exceeds, exclusive of interest and costs, the sum or value of two thousand dollars, and arising under the Constitution or laws of the United States." August 13, 1888, 25 Stat. 433, c. 866, § 1. Robb v. Connolly, 111 U.S. 624, 637; United States v. Barnes, 222 U.S. 513. This is emphasized by the amendment engrafted upon the original act in 1910, to the effect that "The jurisdiction of the courts of the United States under this Act shall be concurrent with that of the courts of the several States, and no case arising under this Act and brought in any state court of competent jurisdiction shall be removed to any court of the United States." The amendment, as appears by its language, instead of granting jurisdiction to the state courts, presupposes that they already possessed it.
Because of some general observations in the opinion of the Supreme Court of Errors, and to the end that the remaining ground of decision advanced therein may be more accurately understood, we deem it well to observe that there is not here involved any attempt by Congress to enlarge or regulate the jurisdiction of state courts or to control or affect their modes of procedure, but only a question of the duty of such a court, when its ordinary jurisdiction *57 as prescribed by local laws is appropriate to the occasion and is invoked in conformity with those laws, to take cognizance of an action to enforce a right of civil recovery arising under the act of Congress and susceptible of adjudication according to the prevailing rules of procedure. We say "when its ordinary jurisdiction as prescribed by local laws is appropriate to the occasion," because we are advised by the decisions of the Supreme Court of Errors that the Superior Courts of the State are courts of general jurisdiction, are empowered to take cognizance of actions to recover for personal injuries and for death, and are accustomed to exercise that jurisdiction, not only in cases where the right of action arose under the laws of that State, but also in cases where it arose in another State, under its laws, and in circumstances in which the laws of Connecticut give no right of recovery, as where the causal negligence was that of a fellow-servant.
The suggestion that the act of Congress is not in harmony with the policy of the State, and therefore that the courts of the State are free to decline jurisdiction, is quite inadmissible, because it presupposes what in legal contemplation does not exist. When Congress, in the exertion of the power confided to it by the Constitution, adopted that act, it spoke for all the people and all the States, and thereby established a policy for all. That policy is as much the policy of Connecticut as if the act had emanated from its own legislature, and should be respected accordingly in the courts of the State. As was said by this court in Claflin v. Houseman, 93 U.S. 130, 136, 137:
"The laws of the United States are laws in the several States, and just as much binding on the citizens and courts thereof as the State laws are. The United States is not a foreign sovereignty as regards the several States, but is a concurrent, and, within its jurisdiction, paramount sovereignty. . . . If an act of Congress gives a penalty [meaning civil and remedial] to a party aggrieved, without *58 specifying a remedy for its enforcement, there is no reason why it should not be enforced, if not provided otherwise by some act of Congress, by a proper action in a state court. The fact that a state court derives its existence and functions from the state laws is no reason why it should not afford relief; because it is subject also to the laws of the United States, and is just as much bound to recognize these as operative within the State as it is to recognize the state laws. The two together form one system of jurisprudence, which constitutes the law of the land for the State; and the courts of the two jurisdictions are not foreign to each other, nor to be treated by each other as such, but as courts of the same country, having jurisdiction partly different and partly concurrent. . . . It is true, the sovereignties are distinct, and neither can interfere with the proper jurisdiction of the other, as was so clearly shown by Chief Justice Taney, in the case of Ableman v. Booth, 21 How. 506; and hence the state courts have no power to revise the action of the Federal courts, nor the Federal the State, except where the Federal Constitution or laws are involved. But this is no reason why the state courts should not be open for the prosecution of rights growing out of the laws of the United States, to which their jurisdiction is competent, and not denied."
We are not disposed to believe that the exercise of jurisdiction by the state courts will be attended by any appreciable inconvenience or confusion; but, be this as it may, it affords no reason for declining a jurisdiction conferred by law. The existence of the jurisdiction creates an implication of duty to exercise it, and that its exercise may be onerous does not militate against that implication. Besides, it is neither new nor unusual in judicial proceedings to apply different rules of law to different situations and subjects, even although possessing some elements of similarity, as where the liability of a public carrier for personal injuries turns upon whether the injured person *59 was a passenger, an employe or a stranger. But it never has been supposed that courts are at liberty to decline cognizance of cases of a particular class merely because the rules of law to be applied in their adjudication are unlike those applied in other cases.
We conclude that rights arising under the act in question may be enforced, as of right, in the courts of the States when their jurisdiction, as prescribed by local laws, is adequate to the occasion.
In No. 289 several rulings in the progress of the cause, not covered by what already has been said, are called in question, but it suffices to say of them that they have been carefully considered, and that we find no reversible error in them.
In Nos. 170, 289 and 290 the judgments are affirmed, and in No. 120 the judgment is reversed and the cause is remanded for further proceedings not inconsistent with this opinion.